# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MISSOURI
# SOUTHERN DIVISION

| | |
|---|---|
| DAVID J. GIRSHNER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 4:16-cv-03451-NKL |
| ) | |
| NANCY A. BERRYHILL, ) | |
| Acting Commissioner ) | |
| of Social Security, ) | |
| ) | |
| Defendant. ) | |

**ORDER**

Plaintiff David Girshner appeals the Commissioner of Social Security's final decision denying his application for disability insurance benefits and supplemental security income under Title II of the Social Security Act. The decision is affirmed.

**I.     Background**

Girshner was born in 1953. He alleges that he became disabled beginning 8/12/2013. His date last insured was 3/31/2014. Following a hearing, the Administrative Law Judge denied Girshner's application on 10/6/2015. The Appeals Council denied his request for review on 9/20/2016. In this appeal, Girshner challenges the ALJ's residual functional capacity ("RFC") assessment and the ALJ's finding that he can perform past relevant work.

**A.     Medical history**

In August 2012, Girshner saw Marsha Taylor, M.D., for chronic lower back pain and lumbar disc strain. Dr. Taylor characterized the pain as intermittent and noted that Girshner treated it with Acetaminophen and Aleve. Dr. Taylor's examination noted midline spinal tenderness in the lumbar region, decreased extension, decreased lateral bending, a positive

crossed straight leg raise, and a negative straight leg raise.

In April 2013, Girshner again saw Dr. Taylor for chronic lower back pain, described as moderate in severity and intermittent in frequency. His range of motion, including lateral bending, was normal, except for mildly decreased extension, and he tested negative on a straight leg raise test. Dr. Taylor diagnosed lumbar disc degeneration and recommended an MRI of the lumbar spine. In addition, she "stressed the importance of regular exercise." Tr. 262.

In November 2013, Girshner visited Dr. Taylor for his wellness exam and requested medication refills for his osteoarthritis prescription. He complained of a decreased range of motion and morning stiffness in his shoulders, back, and knees. At this visit, there was no specific mention of any back pain, aside from his concerns about osteoarthritis.

On May 16, 2014, Girshner again saw Dr. Taylor for chronic back pain, described as moderate in severity and constant in frequency. Girshner described his status as worse but did not complain of nighttime pain. Dr. Taylor described his only attempted treatment as "rest." Girshner's examination revealed midline spinal tenderness and paralumbar tenderness in the lumbar region with moderately decreased extension. Girshner had a positive straight leg raise test and was prescribed Norco for pain. Dr. Taylor diagnosed lumbar spondylosis and ordered an MRI of the lumbar spine. The May 29, 2014 MRI revealed "mild subacute to chronic degenerative spondylosis of the lumbar spine, most severe at the level of L4-5." Tr. 252.

At Girshner's May 30, 2014 appointment, Dr. Taylor noted his back pain as "better" in status. Dr. Taylor again characterized the pain as moderate in severity and constant in frequency, as well as with radiation in the left leg below the knee. Girshner also reported having several weeks of left foot pain, aggravated by walking. Dr. Taylor diagnosed plantar fasciitis and recommended Girshner not wear flip flops and use indepth soles with adequate cushion. She

2

noted that walking and bending aggravated the pain, and rest and muscle relaxers alleviated it.

At Girshner's follow up appointment on October 31, 2014, Dr. Taylor described the status of the pain as "symptoms are stable" with alleviating factors noted as rest, NSAIDs, and muscle relaxers. Tr. 281. Dr. Taylor recorded the pain as moderate in severity and intermittent in frequency with radiation in the left leg above the knee. Bending was the only factor noted as aggravating the pain. Tr. 281. Girshner again tested positive on the straight leg raise test.

### B. Expert opinions

Thomas Corsolini, M.D., a non-treating specialist, performed a physical consultative examination on 7/15/2014. Dr. Corsolini reported that Girshner had negative straight leg raising and that he was able to "walk smoothly without a limp or hesitation and is able to squat independently." Tr. 276. Girshner's upper extremity strength was also full. Tr. 276. Dr. Corsolini opined that Girshner had "some abnormality" in the lower back. Tr. 277. He further opined that, although he did not have Girshner's MRI scans, based on his clinical examination and how Girshner "appears at this time," Dr. Corsolini did not believe he needed any limitations on standing or walking, and that he was "capable of lifting and carrying at least 20 pounds on an occasional basis." Tr. 277.

Arthur Brovender, M.D., a non-examining, non-treating orthopedist who testified as an expert at the hearing opined that Girshner did not have a severe impairment meeting listing 1.04(a) and that Girshner could lift fifty pounds occasionally and twenty pounds frequently. Dr. Brovender assessed the severity of Girshner's spondylosis as "mild." Tr. 17. Dr. Brovender testified that Girshner had no limitations in standing, walking, and sitting; that he could occasionally climb stairs, ladders, ramps, and scaffolds; he could occasionally stoop, kneel, crouch, and crawl; he could occasionally push and pull with his arms, and that his reaching,

3

handling, fingering, and feeling had no limitations.

C.     **Additional History Submitted to the Appeals Council**

On 11/18/2015, several weeks after the hearing, Paul Glynn, D.O., issued a medical source opinion. He opined that Girshner could lift and carry ten pounds frequently and twenty pounds occasionally; that he could stand and/or walk two hours and sit for two hours out of an eight hour work day; that he would be limited in pushing and pulling; that he should limit his stooping, crouching, crawling, and kneeling to occasional use; that he should only occasionally use stairs and never ladders; that he would need to take unscheduled breaks in an eight hour work day due to pain and fatigue; and that the claimant would be limited in his ability to concentrate and that he would miss work due to his severe impairments. Tr. 290-92.

D.     **Hearing Testimony**

Girshner testified that he was fifty-eight years old and completed two years of college education. He is able to read, write, and do simple arithmetic. He has not worked either part-time or full-time since 8/12/2013. He lives by himself, does the cooking, washes the dishes, does his laundry, and sweeps, mops, and vacuums his home. When he goes to the grocery store, he generally goes by himself and is able to carry his grocery bags inside. He still mows his yard with a riding mower, feeds his chickens, and gathers chicken eggs. He also maintains a fifteen by fifteen foot vegetable garden for his own use.

Girshner testified that his back and foot pain were the most likely to prevent him from working, which he rated as a severity of four on a constant basis. He characterized his pain as shooting up as high as an eight when walking, bending over, or lifting things. He testified that because of the pain, he drives less than before but can still drive up to one hour before needing to rest and can sit for approximately one hour. He estimated that he can walk and stand for no more

4

than fifteen minutes before having to stop and rest, and when he has to walk further than 100 yards, he uses a cane. He also reported that when tending to his garden, he uses knee pads and crawls to alleviate the pressure on his back and feet.

Girshner reported foot pain in both feet beginning about eighteen months ago and that the sole treatment—an injection given by Dr. Taylor—did not reduce the pain. He reported taking "as little as possible" of his hydrocodone for the pain because he is "trying to kind of wean [himself] off of it," and he estimated taking this pain reliever only once a week to help him sleep. Tr. 58. Girshner reported that treatment for his back pain, which radiates into his left leg and knee, was limited to three epidural injections he received about seven or eight years ago but nothing else. Otherwise, he has treated this back pain only with over-the-counter medications like Ibuprofen and Aleve. He also testified that he lies on the couch or on a bed for approximately thirty minutes about eight to ten times per day in order to alleviate the pain.

Girshner previously worked for Rainy Gas Company filling and delivering 200-pound propane bottles to customers, refurbishing and recertifying tanks, and replacing tank valves. He testified that he usually used a dolly for transporting the 200-pound bottles and seldom had to actually lift them. In 2011 and 2012, Girshner was self-employed. He and his son ran a lawn-care service, as well as collected and sold aluminum and scrap recycling from the river. He stated that bagging up the recycling required lifting that was "[v]ery seldom over 20 pounds" because he would get his son or someone else to help him get the heavier bags onto the trailer.

George Horne testified as a vocational expert at the hearing. The ALJ posed a hypothetical question assuming an individual with Girshner's education, training, and work experience. The individual could perform medium work, climb stairs and ramps frequently; stoop, kneel, crouch, crawl frequently; climb ladders, scaffolds occasionally; pushing and pulling

with arms, legs, and reaching in all directions frequently. The vocational expert opined that the individual could perform the past work of station operator, salvage laborer, and truck driver. The ALJ posed a second identical hypothetical to the vocational expert except with occasional on climbing stairs and ramps, stooping, kneeling, crouching, and crawling, and occasional pushing and pulling with legs. The vocational expert testified that such an individual would still be able to perform the past work of station operator.

The ALJ made an alternative step five finding by asking the vocational expert if such an individual could perform any other medium jobs. The vocational expert testified that there was medium, unskilled work he could perform, such as a packager with 50,000 in the national economy and back loader with 10,000 in the national economy.

### E. The ALJ's Decision

The ALJ found that Girshner had severe impairments of degenerative disc disease of the lumbar spine and osteoarthritis. Tr. 12. However, the ALJ found that he did not have an impairment or combination of impairments that met any Listings. Tr. 13. The ALJ concluded that Girshner had the residual functional capacity to perform:

> medium work as defined in 20 CFR 404.1567(c) except he could occasionally climb ladders and scaffolds; he could frequently climb stairs and ramps, stoop, kneel, crouch, and crawl; and he could frequently push and pull with the arms and legs and reach in all directions.

Tr. 14. The ALJ came to this conclusion, in part, by finding that Girshner's subjective limitations were not fully credible. The ALJ reasoned that Girshner's medical records failed to show treatment consistent with a disability and that his clinical examinations revealed he had normal strength and gait, contradicting Girshner's claimed limitations. The ALJ considered medical opinion evidence that supported Girshner's RFC, resolved conflicts between the

6

opinions, and explained how he had weighed them. Finally, the ALJ relied on vocational expert testimony, finding that Girshner retained the ability to perform three of his past relevant jobs as gas pumping station operator, salvage laborer, and delivery truck driver. Tr. 17-19. Also based on vocational expert testimony, the ALJ proceeded to step five to make an alternative finding that Girshner could still perform other jobs found in significant numbers in the national economy. The ALJ concluded that Girshner was not disabled, and benefits were denied. Tr. 19.

## II.     Discussion

Girshner argues that reversal is necessary because the ALJ did not properly weigh the opinion evidence between the two main medical opinions in the record and did not review a post-decision opinion he submitted from a third doctor. He further argues that the Commissioner erred by not correctly classifying his past relevant work as a gas station pumping operator. Thus, the specific issues before this Court are: (1) whether substantial evidence supports the ALJ's RFC assessment and weighing of medical opinion evidence and (2) whether substantial evidence supports the ALJ's finding that Girshner could perform past relevant work.

The Court's review of the Commissioner's decision is limited to a determination of whether the decision is supported by substantial evidence on the record as a whole. *Milam v. Colvin*, 794 F.3d 978, 983 (8th Cir. 2015). Substantial evidence is less than a preponderance but enough that a reasonable mind might accept as adequate to support the Commissioner's conclusion. *Id*. The Court must consider evidence that both supports and detracts from the Commissioner's decision but cannot reverse the decision because substantial evidence also exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Andrews v. Colvin*, 791 F.3d 923, 928 (8th Cir. 2015). If the Court finds that the evidence supports two inconsistent positions and one of those positions represents

the Commissioner's findings, then the Commissioner's decision must be affirmed. *Wright v. Colvin*, 789 F.3d 847, 852 (8th Cir. 2015).

### A. The RFC Assessment

Girshner argues that the ALJ incorrectly assessed his RFC by not properly weighing the medical opinion evidence. Specifically, Girshner contends that the ALJ should have assigned less weight to the opinion from the examining medical consultant, Dr. Corsolini, and more weight to a medical source opinion from the non-examining medical expert, Dr. Brovender. In addition, Girshner complains that the Commissioner did not review a post-decision opinion he submitted from a third doctor, Dr. Glynn.

Residual functional capacity refers to what a claimant can still do despite physical or mental limitations. 20 C.F.R. § 404.1545(a); *Masters v. Barnhart,* 363 F.3d 731, 737 (8th Cir. 2004). An ALJ must formulate the RFC based on all of the relevant, credible evidence in the record. *See Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012) ("Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner.") (quoting *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007)). The RFC determination must be supported by substantial evidence, including at least some medical evidence. *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000). Evidence relevant to the RFC determination includes medical records, observations of treating physicians and others, and a claimant's own description of his limitations. *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000) (citation omitted). The claimant has the burden to prove his or her RFC. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001).

First, although the ALJ's credibility assessment was fundamental to the RFC determination, Girshner offers little challenge to it. The ALJ must assess the credibility of a

claimant's subjective complaints by considering: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ may also discount a claimant's subjective claims based on "inherent inconsistencies" in the record. *Travis v. Astrue*, 477 F.3d 1037, 1042 (8th Cir. 2007).

Here, the ALJ's decision offered a detailed analysis of Girshner's subjective complaints within the context of the record as a whole. The ALJ acknowledged Girshner's complaints of back pain radiating into his left knee and that a May 2014 MRI scan revealed "mild" spondylosis. Tr. 15, 252. The ALJ went on to explain that despite these complaints, Dr. Corsolini's consultative examination revealed Girshner had normal strength and normal reflexes. Tr. 15, 276-77. The ALJ considered that Girshner had not sought any aggressive treatment for his back pain. Girshner last received epidural injections at least seven years ago, and no doctor had ever advised him to seek physical therapy, surgery, or pain management, such as a TENS unit. Tr. 15, 58-59, 252.

The ALJ addressed his complaints about knee pain and his associated osteoarthritis diagnosis. Tr. 15. The ALJ considered that Dr. Corsolini's July 2015 examination revealed Girshner had a clinically normal range of motion in his knees, as well as a normal and "smooth" gait without any limp. Tr. 15, 277. As with his back pain, Girshner never sought any treatment from a specialist for his knee pain. Tr. 15. Rather, all of his treatment was rendered by a general practitioner, Dr. Taylor. Tr. 15, 157. Further, the ALJ cast doubt on Girshner's testimony about requiring a cane for mobility, observing that the record was devoid of any medical evidence that the cane was prescribed by any of Girshner's doctors or necessary. Tr. 15, 42, 65, 216.

9

Moreover, the ALJ found Girshner's use of non-prescription pain medication was inconsistent with his allegations about the level of pain he experienced. Despite Girshner's complaints of severe, disabling pain in his back and knees, Girshner stated he mainly used non-prescription pain medication, such as Aleve and Ibuprofen. He reported only having a few prescription hydrocodone pills left but indicated he took these pills only once a week for sleep. He had not renewed his prescription in months because he was trying to "wean" himself off of it.

In addition, the ALJ properly considered Girshner's reported daily activities, an important factor to the ALJ's overall analysis. *See Clevenger v. Soc. Sec. Admin.*, 567 F.3d 971, 976 (8th Cir. 2009) (despite mixed signals in case law, it is important for the ALJ to cite activities as part of the credibility assessment). For example, despite Girshner's complaints, Girshner stated he lived alone; took care of his pets and chickens; prepared simple meals; washed dishes, mopped, swept, and shopped; enjoyed gardening and tended to his own 15 by 15 foot garden; and regularly mowed his lawn with a riding mower. Tr. 15-16, 61-62, 70, 211-17. *See McDade v. Astrue*, 720 F.3d 994, 998 (8th Cir. 2013) (McDade "was not unduly restricted in his daily activities, which included the ability to perform some cooking, take care of his dogs, use a computer, drive with a neck brace, and shop for groceries with the use of an electric cart.").

Girshner also argues that the ALJ erred when he weighed the relevant medical opinion evidence. The amount of weight given a treating medical source opinion depends upon support for the opinion found in the record; its consistency with the record; and whether it rests upon conclusory statements. An ALJ must give controlling weight to a treating medical source opinion if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence. *Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015). The opinion may be given "limited weight if it provides

conclusory statements only, or is inconsistent with the record." *Id.* (citations omitted). In addition, the ALJ "may discount or even disregard the opinion . . . where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Id.* (quoting *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015)).

### 1. Dr. Corsolini

Dr. Corsolini is a specialist in his field and had the opportunity to examine Girshner for his report. The ALJ gave "great weight" to his opinion, which was based on a physical consultative examination of Girshner on July 15, 2014. Tr. 16, 276. In his report, Dr. Corsolini noted that he did not have Girshner's MRI scans, but based on his clinical examination and how Girshner "appears at this time," he did not believe Girshner needed any limitations on standing or walking and that he was "capable of lifting and carrying at least 20 pounds on an occasional basis." Tr. 277. He further opined that Girshner had "some abnormality" in his lower back but that he had a negative straight leg raising test, and that he was able to "walk smoothly without a limp or hesitation and is able to squat independently." Tr. 276. Girshner's upper extremity strength was also full. Tr. 277-76.

The ALJ cited these opinions as consistent with the remainder of the record. Tr. 16. Although the ALJ gave Dr. Corsolini's opinion great weight, the ALJ elected to impose additional limitations on Girshner's RFC in order to give Girshner "the utmost benefit of the doubt." Tr. 16. Specifically, although Dr. Corsolini opined that Girshner did not need any limitations on standing or walking and that he was capable of lifting and carrying at least twenty pounds on an occasional basis, the ALJ instead found Girshner was limited as follows: he could occasionally climb ladders and scaffolds; frequently climb stairs and ramps, stoop, kneel, crouch,

11

and crawl; and frequently push and pull with the arms and legs and reach in all directions. Tr. 14. Substantial evidence on the whole record supports the ALJ's decision to give Dr. Corsolini's opinion great weight.

2. **Dr. Brovender**

Dr. Brovender is a non-examining specialist in orthopedics and testified as a medical expert at Girshner's hearing. Tr. 16. Girshner contends that the ALJ "disregarded" part of Dr. Brovender's opinion, which provided for strength limitations greater than those assigned by the ALJ. Girshner reasons that if the ALJ had found the additional limitations opined to by Dr. Brovender—specifically, the limitation of occasionally pushing and pulling with his arms and legs and occasionally stooping, kneeling, crouching, and crawling—then Girshner would be limited to light, unskilled work instead of medium work.

The ALJ observed that much of Dr. Brovender's opinion was consistent with Dr. Corsolini's opinion and the ALJ's own review of the evidence. Consistent with the ALJ's findings, Dr. Brovender testified that Girshner's impairments did not meet or equal a Listing during the relevant period. Dr. Brovender opined that Girshner's use of a cane was not appropriate, that his spondylosis was not unusual for his age, and that Girshner's MRI scans had shown only "mild" spondylosis. Tr. 17, 42-43. Consistent with the ALJ's findings, Dr. Brovender concluded that Girshner could lift 50 pounds occasionally and 20 pounds frequently; that he had no limitations in standing, walking, and sitting in an 8-hour workday; that he could occasionally climb stairs and ramps, ladders, and scaffolds; and that he had no limitations in handling, fingering, or feeling; had no environmental limitations; and had no limitations to heat, humidity, or wetness.

In contrast to Girshner's contention that the ALJ "disregarded" the part of Dr.

Brovender's opinion that differed from his own, the ALJ specifically explained this difference. The ALJ observed that Dr. Brovender's opinion differed from the ALJ's findings by opining greater postural limitations and limitations in the use of Girshner's extremities. Tr. 17. Although the ALJ gave this portion of the opinion "little weight," he still afforded the remainder of Dr. Brovender's opinion "some weight," noting that it was not significantly different from his own findings. Tr. 17.

Substantial evidence on the whole record supports the ALJ's decision to give this portion of the opinion less weight. First, Dr. Brovender reported that Girshner's strength, gait, and reflexes were normal in neurological testing. Tr. 38. The record does not reflect that any treating provider ever instructed Girshner to limit these activities. Furthermore, Dr. Brovender did not offer any specific explanation for why he suggested the greater postural and extremity limitations. Tr. 40. When a non-examining doctor has not sufficiently explained his assessment, the ALJ is not required to defer to it. *See* 20 C.F.R. § 416.927(c)(3) ("because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions"). Such opinions may appropriately be given less weight. *See Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (holding that the ALJ properly discounted a treating source opinion due to its conclusory nature and because the assertions were not supported by and were inconsistent with the information contained in the doctor's treatment notes and other medical records).

### 3. Dr. Glynn

Finally, Girshner argues that the ALJ denied his claim without considering Dr. Glynn's post-hearing medical source opinion. Girshner argues that Dr. Glynn's opinion as to his

13

impairments would substantiate a finding that Girshner is limited to light, unskilled work. Girshner submitted Dr. Glynn's November 18, 2015 medical source statement to the Appeals Council a little more than one month after the ALJ had issued his decision. Tr. 19, 292. In the form, Dr. Glynn endorsed disabling-level limitations, including that Girshner could only sit, stand, and walk for four hours total and that Girshner would miss more than four workdays per month. Tr. 290-91.

If the Appeals Council finds that the ALJ's actions, findings, or conclusions are contrary to the weight of the evidence, including the new evidence, it will review the case. *See* 20 C.F.R. § 404.970(b). In its September 20, 2016 denial of further review, the Appeals Council did consider Dr. Glynn's evidence but concluded that "this information does not provide a basis for changing the Administrative Law Judge's decision." Tr. 2. *See, e.g., Joyner v. Astrue*, 584 F. Supp. 2d 1203, 1221 (N.D. Iowa 2008) (Appeals Council concluded "additional evidence . . . do[es] not provide a basis for changing the Administrative Law Judge's decision;" thus, doctor's report submitted by the claimant did not justify changing the ALJ's decision); *Holden v. Astrue*, 2011 WL 2730914, *33-34 (E.D. Mo. 2011) (Appeals Council sufficiently considered evidence when it listed the exhibits in its attached exhibit list).

Because the Appeals Council included Dr. Glynn's evidence in the record but concluded that it would not change the ALJ's decision, the doctor's reports are considered part of the administrative record under review. *See Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007) ("Where, as here, the Appeals Council considers new evidence but denies review, we must determine whether the ALJ's decision was supported by substantial evidence on the record as a whole, including the new evidence."). But as the Appeals Council concluded, substantial evidence supports the ALJ's decision notwithstanding Dr. Glynn's opinion. First, Dr. Glynn did

14

not render his opinion until November 2015. Because the opinion was rendered after the ALJ's October 6, 2015 hearing decision, it is not relevant to the time period under review. Tr. 19. *See Sullins v. Shalala,* 25 F.3d 601, 604-05 (8th Cir. 1994) (evidence of newly developed psychiatric symptoms not relevant because they did not occur until a few weeks after the ALJ's decision); *Jones v. Callahan*, 122 F.3d 1148, 1154 (8th Cir. 1997) (to be relevant, post-ALJ-decision evidence must pertain to the claimant's condition during the relevant period). Second, even if Dr. Glynn had rendered a timely opinion, he did not have any new or material clinical evidence of signs or symptoms. As discussed previously, the Commissioner does not assign weight to medical opinions that are unsupported and inconsistent with the remainder of the record. Finally, the fact that this was a one-time consultative examination conducted after the ALJ's decision means that it should be considered a litigation advocacy document, not a treatment record. *See Weetman v. Sullivan*, 877 F.2d 20, 23 (9th Cir. 1989) (doctor's opinion solicited after the ALJ's negative decision is less convincing); *House v. Astrue*, 500 F.3d 741, 745 (8th Cir. 2007) ("As Dr. McFarlin had been urging House to seek disability benefits since before June 2002, the ALJ had good reason to discount the new inconsistent opinions that House lacked the capacity to engage in sedentary occupations that require prolonged sitting. These opinions were rather obviously based upon Dr. McFarlin's understanding of the relevant disability criteria, not on medical evidence.").

For these reasons, the ALJ's credibility assessment and weighing of medical opinion evidence is supported by substantial evidence. Because the ALJ gave good reasons for finding Girshner was not fully credible, the Court must defer to the ALJ's judgment, even if the Court would have reached a different decision had it been deciding the claimant's case. *See Buckner*, 646 F.3d at 556; *Smith*, 756 F.3d at 625 ("We defer to the ALJ's evaluation of [a claimant's]

credibility, provided that such determination is supported by good reasons and substantial evidence, even if every factor is not discussed in depth." (internal citations omitted)).  As part of that credibility assessment, it is also the ALJ's task to resolve conflicts among medical opinions, not the Court's.  *See Finch v. Astrue*, 547 F.3d 933, 936 (8th Cir. 2008) ("The ALJ is charged with the responsibility of resolving conflicts among medical opinions.").  Because substantial evidence on the whole record supports the ALJ's weighing of the conflicts in the medical opinions and the ALJ's RFC determination, these findings will not be disturbed.

### B.     The Assessment of Past Relevant Work

After assessing Girshner's credibility, the ALJ concluded that Girshner retained the RFC to perform medium work as defined in 20 C.F.R. § 404.1567(c), except that he could occasionally climb ladders and scaffolds; frequently climb stairs and ramps, stoop, kneel, crouch, and crawl; and frequently push and pull with the arms and legs and reach in all directions.  Tr. 14.  *See McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000) (the Commissioner must determine a claimant's RFC based on all of the relevant evidence, including medical records, observations of treating physicians and others, and an individual's own description of his limitations).  *See also* 20 C.F.R. § 404.1545.

Next, as required by step four of the sequential evaluation process, the ALJ compared Girshner's RFC with the demands of his past relevant work.  The ALJ concluded that Girshner retained the RFC to return to his past relevant work as a (1) gas pumping station operator, (2) salvage laborer, and (3) delivery truck driver.  Tr. 17.  The ALJ based this conclusion on the vocational expert's testimony at the hearing.  The ALJ is permitted to rely on a vocational expert in order to determine whether a claimant can perform his past relevant work, either as he performed it or as it is performed in the national economic.  20 C.F.R. § 404.1560(b)(2).

Girshner, however, challenges this step four assessment by arguing that the ALJ misclassified his past relevant work as a station pumping operator instead of as a compressed gas worker. Specifically, he contends that the ALJ's analysis overlooked his testimony about lifting propane bottles of up to 200 pounds, which he contends is better reflected in the description for compressed gas worker.

Regardless of the merits of this argument, Girshner's argument must fail because he does not challenge the other two past jobs that the ALJ found he could perform: as a salvage laborer and delivery truck driver. Tr. 73-75. So long as a claimant can perform *a* past job, either as it is performed or as it is performed in the national economy, he will not be found disabled at step four. *See* 20 C.F.R. § 404.1560(b)(2) (in order to progress beyond step four, a claimant must show that she cannot perform past relevant work as she performed it or as it is generally performed in the national economy). Therefore, even accepting Girshner's contention as true, Girshner was still found able to perform two other past jobs, which remain unchallenged and result in a denial of benefits.[1]

Girshner's reliance on *Brown v. Apfel*, 990 F.Supp. 714 (S.D. Iowa 1998) does not require a different outcome. In *Brown*, the ALJ found at step four that the claimant was able to do her past relevant work as a general office helper. *Id.* On appeal, the claimant argued that there was no evidence to support a finding that she had ever worked general office helper duties. *Id.* The district court agreed, explaining that there was no evidence in the record showing that she could perform the duties required for a general office helper, and the only evidence about the

---

[1] Furthermore, Girshner does not challenge the ALJ's alternate step five determination that there were also jobs existing in significant numbers in the national economy that Girshner could perform: as a packager and bag loader. Tr. 18. However, because the Court affirms the ALJ's findings at step four, it need not evaluate this alternative finding.

claimant's clerical duties was limited to a doctor's note that she had "worked as a key punch operator at different places." *Id.* The district court also emphasized that the claimant was never asked to describe her "clerical" work at the hearing. *Id.* at 718. In addition, the district court explained that the vocational expert had testified that each of the claimant's other past jobs was precluded due to her exertional limitations. *Id.*

In contrast to *Brown* in which the ALJ found only one past position that the claimant could perform, the ALJ in this case found three past jobs that Girshner could perform, two of which he does not challenge. Also in contrast, the ALJ in this appeal specifically questioned Girshner at his hearing about his past work as a salvage laborer and delivery truck driver, resulting in a sufficiently developed record.

For these reasons, Girshner's challenge to the ALJ's step four determination must fail. Girshner had a fair hearing and full administrative consideration. Substantial evidence on the record as a whole supports the Commissioner's decision.

## III. Conclusion

The Commissioner's decision is affirmed.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: July 3, 2017
Jefferson City, Missouri